Patrick M. Flatley
United States Bankruptcy Judge

**Dated: Friday, September 18, 2015 3:07:36 PM**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| SHIRLEY E. GODFREY, | ) | Case No. 1:12-bk-1473 |
| | ) | |
| Debtor. | ) | Chapter 7 |
| | ) | |
| IN RE: | ) | |
| | ) | |
| MORGANTOWN EXCAVATORS, INC., | ) | Case No. 1:12-bk-570 |
| | ) | |
| Debtor | ) | Chapter 7 |
| _____ | ) | |
| | ) | |
| MORGANTOWN EXCAVATORS, INC., | ) | |
| and SHIRLEY E. GODFREY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adv. Proc No. 1:13-ap-24 |
| | ) | |
| THE HUNTINGTON NATIONAL BANK, | ) | |
| and MYRON BOWLING AUCTIONEERS, | ) | |
| INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Shirely E. Godfrey, Morgantown Excavators, Inc. ("MEI"), and their respective Chapter 7 bankruptcy estates (collectively, the "Plaintiffs"), filed their complaint against The Huntington National Bank ("HNB") and Myron Bowling Auctioneers, Inc. ("Myron Bowling"), alleging multiple violations of the West Virginia Commercial Code and other applicable state law based on HNB's sale of MEI's equipment collateral to Myron Bowling.

HNB seeks entry of three declarations on summary judgment: (1) MEI and Mr. Godfrey waived the right to receive notice of default from HNB; (2) HNB complied with its contractual and statutory obligations to provide notices of disposition of collateral to MEI and Mr. Godfrey by sending the notices in care of their attorney; and (3) HNB sold MEI's equipment to Myron Bowling with reasonable notice and in a commercially reasonable manner.

Myron Bowling also seeks entry of summary judgment on the grounds that it purchased MEI's equipment from HNB in good faith without notice of any sale defect under W. Va. Code § 46-9-617(b).

For the reasons stated herein, the court will grant summary judgment on the first two requested declarations by HNB, deny summary judgment on the third, and will dismiss Myron Bowling as a defendant to the Plaintiffs' complaint.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56, made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment is only appropriate if the movant demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   A party seeking summary judgment must make a prima facie case by showing: first, the apparent absence of any genuine dispute of material fact; and second, the movant's entitlement to judgment as a matter of law on the basis of undisputed facts.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   The movant bears the burden of proof to establish that there is no genuine dispute of material fact.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).   Demonstrating an absence of any genuine dispute as to any material fact satisfies this burden. *Id.* at 323.   Material facts are those necessary to establish the elements of the cause of action.  *Anderson*, 477 U.S. at 248.   Thus, the existence of a factual dispute is material — thereby precluding summary judgment — only if the disputed fact is determinative of the outcome under applicable law.  *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). A movant is entitled to judgment as a matter of law if "the record as a whole could not lead a rational trier of fact to find for the non-movant." *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991).

If the moving party shows that there is no genuine dispute of material fact, the nonmoving party must set forth specific facts that demonstrate the existence of a genuine dispute of fact for

2

trial. *Celotex Corp.*, 477 U.S. at 322-23. The court is required to view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Shaw*, 13 F.3d at 798. However, the court's role is not "to weigh the evidence and determine the truth of the matter [but to] determine whether there is a need for a trial." *Anderson*, 477 U.S. at 249-50. Nor should the court make credibility determinations. *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986). If no genuine issue of material fact exists, the court has a duty to prevent claims and defenses not supported in fact from proceeding to trial. *Celotex Corp.*, 477 U.S. at 317, 323-24. Thus, for the movant to prevail on its motion for summary judgment, it must demonstrate that the material facts are not in dispute and there is an absence of evidence to create a triable issue regarding every necessary element of its claims.

## II. BACKGROUND

Mr. Godfrey was the principal and sole shareholder of MEI. To finance its operations, MEI executed several promissory notes to HNB on April 9, 2010. Each of the notes was personally guaranteed by Mr. Godfrey,[1] and MEI granted HNB a security interest in multiple categories of collateral – including its equipment.

MEI did not maintain payments on its promissory notes to HNB and the parties executed two subsequent forbearance agreements, the first on June 1, 2011, and the second on November 4, 2011. By its terms, omitting a prior event of default, the November 4, 2011 forbearance agreement expired on March 2, 2012. Norman Solomon, the Vice President of HNB's Special Assets Division, anticipated MEI's default under the November 4, 2011 forbearance agreement and the necessity to sell MEI's equipment. On January 19, 2012, Debra Bowers, MEI's and Mr. Godfrey's attorney, noted in a letter to HNB that MEI was in default for three monthly payments.

The following day, HNB's counsel wrote to Ms. Bowers stating that HNB would be engaging an auction company to repossess and prepare MEI's equipment for sale. Two companies came to look at MEI's equipment for the purpose of potentially buying and/or selling it. Also, other business entities interested in potentially acquiring MEI's assets made inquiry to

---

[1] The total principal amount of Mr. Godfrey's personal guarantee was $2,044,571, and his guarantee references five loans in the following amounts: (1) $300,000 revolving line of credit, (2) $472,000 term loan, (3) $150,000 time loan, (4) $710,880 term loan, and (5) $350,000 letter of credit. The remaining $61,691 was related to HNB's swap credit exposure derived from the "Rate Management Transaction" between HNB and MEI.

HNB.   One of those entities, Pyle Equipment, attempted to contact HNB about purchasing MEI's equipment, which it believed to have a total value in excess of $600,000.   While Pyle Equipment was unsuccessful in obtaining any response from HNB, on February 27, 2012, HNB executed an asset purchase agreement with Myron Bowling for certain equipment in MEI's possession.   The purchase price was $535,000.   In the asset purchase agreement, the parties acknowledged that HNB may have to transfer certain equipment to Myron Bowling through a sale under Article 9 of the Uniform Commercial Code.   Phillip E. Langer, the attorney for Myron Bowling, submitted a declaration in conjunction Myron Bowling's motion of summary judgment stating: "I asked legal counsel representing [HNB] whether the provisions of Article 9 of the Uniform Commercial Code . . . were being followed, and specifically whether notification of a private disposition had been sent to the appropriate parties.   [HNB's] counsel confirmed that it was complying with Article 9 and that a notification had been sent before Myron Bowling entered into [the February 27, 2012 asset purchase] agreement."   (Document No. 129, Ex. 1).

On March 2, 2012, HNB wrote Ms. Bowers that "Myron Bowling Auctioneers will be coming to pick up equipment collateral on Monday, March 5, 2012, as [HNB's] agent." (Document No. 154, Ex. 15).   On March 22, 2012, HNB issued its notice of private disposition that it was going to sell MEI's equipment "sometime after April 9, 2012."   (Document No. 113, Ex. L).   Two notices of private disposition were sent by HNB: one to MEI and one to Mr. Godfrey. Both notices were mailed "c/o Debra Bowers" at her law firm address – not to MEI's business address or Mr. Godfrey's home address.   One day later, on March 23, 2012, Myron Bowling paid HNB the full purchase price for MEI's equipment.

Meanwhile, MEI, through its regular business mail, received an auction flyer from Myron Bowling wherein a public auction was scheduled for MEI's equipment on April 20, 2012.   On April 5, 2012, Ms. Bowers made a settlement offer to HNB of $1,300,000 whereby MEI would pay it proceeds from certain real property sales by May 1, 2012, and pay the rest in cash.   In response, HNB's counsel emailed Mr. Bowers on April 5, 2012, and agreed to postpone foreclosure sales of certain real estate, but stated the April 9, 2012 private sale of MEI's equipment would go forward as planned.

The date of private disposition noticed for "sometime after April 9, 2012" and Myron

4

Bowling's public auction scheduled for April 20, 2012, caused some confusion on the part of Ms. Bowers and her clients.   Ms. Bowers wrote HNB's counsel on April 6, 2012: "MEI received written notice (the flyer of the sale being publically announced) of the public sale on April 20th so I note you indicate there is a private sale.   Was this a private sale based on sealed bids or where did this come from? Guess I'm a little confused.   Could you confirm."   (Document No. 154, Ex. 21).

In the late afternoon on Friday, April 6, 2012, counsel for HNB responded that HNB had accepted an offer from Myron Bowling to purchase MEI's equipment in a private sale, which would occur after the following Monday unless HNB received a better offer.   In addition, HNB's counsel explained that the notice of public sale was effected by Myron Bowling – not HNB – and Myron Bowling intended to auction MEI's equipment after purchasing it from HNB.

On April 9, 2012, MEI submitted a bid for its equipment in the amount of $500,000 and requested an accounting and the details of the previously submitted bids.   In submitting its bid, MEI was not aware of the amount Myron Bowling agreed to pay under its asset purchase agreement, the identity of other potential purchasers, or the amount of other offers.   On April 10, 2012, HNB's counsel informed Ms. Bowers that it received two offers for the equipment in addition to MEI's letter bid.   HNB determined that Myron Bowling had the highest and best offer, which HNB had accepted.   HNB executed the bill of sale to Myron Bowling on April 18, 2012, and Myron Bowling subsequently auctioned the equipment on April 20, 2012.

### III. DISCUSSION

HNB seeks entry of three declarations on summary judgment: (1) MEI and Mr. Godfrey waived the right to receive notice of default from HNB; (2) HNB complied with its contractual and statutory obligations to provide notices of disposition of collateral to MEI and Mr. Godfrey by sending the notices in care of their attorney; and (3) HNB sold MEI's equipment to Myron Bowling with reasonable notice and in a commercially reasonable manner.   The court will consider these three grounds, and Myron Bowling's status as a good faith purchaser, in turn.

**1.      Waiver of Notice of Default under the November 4, 2011 Forbearance Agreement**

HNB assets that MEI and Mr. Godfrey expressly waived notice of default under the terms of the November 4, 2011 Forbearance Agreement.   HNB's argument relates to ¶ 15 of the

5

complaint, which states:

> 15. No notice of default was ever declared by or delivered to either MEI or Shirley E. Godfrey by the Huntington National Bank under the terms of any forbearance agreement.

(Compl. ¶ 15).

Under the parties' June 1, 2011 forbearance agreement, MEI and Mr. Godfrey expressly waived any written notice of default for payments made pursuant to that agreement: "Notwithstanding anything contained in the Loan Documents, no written notice of default shall be required to be given by Lender to Obligors for payments to be made pursuant to this Agreement." (Document No. 113, Ex. E, p.4).   This waiver of notice of default was incorporated into the parties' November 4, 2011 forbearance agreement.   Moreover, on January 19, 2012, Ms. Bowers wrote HNB's counsel expressly noting that MEI had not made the three previous payments to HNB; clearly demonstrating knowledge of default on MEI's behalf.

HNB is thus entitled to entry of a declaration on summary judgment that it was not required to provide notice of payment default to MEI or Mr. Godfrey under the terms of the November 4, 2011 forbearance agreement.

**2.      Notice of Disposition of Collateral Sent in Care of MEI's and Mr. Godfrey's Attorney**

HNB asserts that it was not required to send its March 22, 2012 authenticated notices of disposition of MEI's collateral to Mr. Godfrey's individual address or MEI's business addresses because it sent the authenticated notices to each of them in care of their attorney.

The Plaintiffs contend that HNB had a contractual obligation to mail the authenticated notice of disposition to MEI at its business address under the parties April 9, 2010 security agreement, and a statutory obligation to send the authenticated notices of disposition to MEI's business address and Mr. Godfrey's individual address pursuant to W. Va. Code § 46-9-611(c).

Regarding HNB's contractual obligation to provide notice to MEI under its April 9, 2010 security agreement, the agreement provides:

> **Sell the Collateral**. [HNB] will give [MEI] and other parties entitled to notice reasonable notice of . . . the time after which any private sale . . . is to be made. . . .
>
> . . . .
>
> **Notices.** All notices required to be given under this Agreement shall be given in

6

writing . . . and shall be effective when actually delivered or when deposited with a nationally recognized overnight courier or deposited in the United States mail, first class, postage prepaid, addressed to the party to whom the notice is to be given at [500 Hartman Run Road, Morgantown, West Virginia 16505].

(Document No. 113-2, Ex. C, pp.10, 12).

Pursuant to W. Va. Code § 46-9-611(c), HNB was required to "send an authenticated notification of disposition to: (1) The debtor; (2) Any secondary obligor . . . ."

As an agent, notice to an attorney is imputable to the client when the notice is within the scope of the attorney's representation. *E.g.*, *Brewster v. Hines*, 185 S.E.2d 513, 521 (W. Va. 1971) (notice "to defend title" served on an attorney was notice to the client even though the notice was not specifically sent to the client).   For example, in the case of *In re Brown*, 234 B.R. 907 (Bankr. W.D. Mo. 1999), a secured party sent its notice of disposition of collateral to the debtors' chapter 11 attorney.   In rejecting the debtors' argument that the notice of disposition was defective because it was mailed to the debtors' attorney and not the debtors, the court noted that no requirement exists in the Uniform Commercial Code that the debtor's address be the debtor's home address, the debtors' specifically designated their attorney to act as their agent in all related matters, and the debtors made no allegation that their attorney failed to notify them of the proposed disposition of the collateral.   *Id.* at 915-16.

Similarly, in *Chase Manhattan Bank, N. A. v. Natarelli*, 93 Misc. 2d 78, 81 (N.Y. Sup. Ct. 1977),[2] personal notice of a proposed sale was given to the attorney for the debtor corporation, and the attorney also represented two of the corporate officers and guarantors.   One of the guarantors was not sent personal notice of the proposed disposition.   *Id.*   The court determined, however, that the guarantor was the secretary of a small, closely owned and family operated corporation.   *Id.* at 413.   She lived and worked with her guarantor-husband, who had actual knowledge of the proposed notice of disposition, she was represented by the same legal counsel, and public notice of the proposed disposition was published in two newspapers.   *Id.*   Based on

---

[2] *Natarelli* concerned the interpretation of Uniform Commercial Code § 9-504(3), which was repealed with the 2001 revisions to the Uniform Commercial Code.   As compared to modern § 9-611(c), the language is largely the same, except that "authenticated notification" is now required.   The requirement of authentication was intended to overturn cases that read former § 9-504(3) as validating oral notifications.   American Law Institute, 6AP4-*Revised Article 9 UCC Reporter-Digest* § 9-611, cmt. 5 (1998).

these facts, the court inferred and imputed notice of the dispositional sale on the guarantor.  *Id*.

Additionally, in *Brunswick Acceptance Co., LLC v. MEJ, LLC*, 292 S.W.3d 638, 643 (Tenn. App. 2008), the secured creditor sent notice of a proposed disposition of collateral to the business-debtor's counsel and not to the business itself.  The court held, however, that the sole owner of the business entity had actual notice of the proposed disposition because he was informed of the disposition by email from counsel, he had specifically agreed that notices may be sent to his attorney, specifically approved of some of the proposed dispositions before they occurred, and had the opportunity to solicit competitive offers.  *Id.* at 640-41, 644.

Finally, in *Price v. Monroe Bank & Trust*, No. 227118, 2002 WL 31928601 (Mich. App. Nov. 8, 2002) (unpub.), a notice of auction was sent to the debtor's legal counsel instead of to the debtor.  The court, however, was not persuaded that the notice was insufficient: "If the representation by the attorney was for a matter wholly unrelated to the foreclosure, perhaps it could be said that it is unreasonable to send notice to the attorney[; b]ut, we do not think it unreasonable for a creditor to send a notice through debtor's bankruptcy attorney."  *Id.* at \*1.  Moreover, the court noted that the debtor's attorney advised the debtor of the receipt of notice and the debtor was actually in attendance at the auction.  *Id.* at \*1.

Accordingly, in each of the above four cases, the secured creditor sent the notice of disposition to the debtor's attorney – not the debtor – and all four courts held that the notice was proper.  All four courts also determined that each of the debtors had actual knowledge of the proposed disposition and that the attorney receiving notice was representing the debtor with regard to the subject matter of the notice.

Here, HNB sent two authenticated notices of disposition, one to MEI and one to Mr. Godfrey, in care of Ms. Bowers at her law firm address, and there is no dispute that Ms. Bowers was representing her clients with regard to the subject matter of the notice.  In fact, Ms. Bowers actively represented MEI and Mr. Godfrey between the time HNB sent the notices to her on March 22, 2012, and April 9, 2012, the date after which a private disposition could be accomplished.  For example, on April 5, 2012, Ms. Bowers sent HNB's counsel a settlement proposal that, if accepted, would have obviated the noticed sale of MEI's equipment.  On April 6, 2012, Ms. Bowers sent MEI an email chain wherein HNB's counsel stated that the private sale of MEI's equipment would

8

be going forward on April 9, 2012.[3]   MEI and Mr. Godfrey were able to submit a bid for MEI's equipment on April 9, 2012.   MEI and Mr. Godfrey complain only that they did not have actual knowledge of contents of the notice until April 20, 2012, when Ms. Bowers sent MEI a copy of the notification.

Based on these facts, the court holds that HNB's March 22, 2012 authenticated notices of disposition sent to MEI and Mr. Godfrey in care of Ms. Bowers at her law firm address satisfied the requirement in W. Va. Code § 46-9-611(c) that notice be sent to the debtor and any secondary obligor because: (1) Ms. Bowers was acting as the debtor's and secondary obligor's attorney; (2) Ms. Bowers was acting as their attorney specifically with regard to HNB's disposition of MEI's collateral, (3) Ms. Bowers was actively engaged during the notice period in attempting to negotiate with HNB, (4) Ms. Bowers informed MEI of the private sale set "for sometime after April 9," and (5) MEI and Mr. Godfrey were actually able to submit a bid for its equipment on April 9th.

Regarding HNB's contractual obligation to provide notice to MEI under the April 9, 2010 security agreement, HNB had the option to effect "actual delivery" in lieu of mailing notices to a specified address.   Because HNB actually delivered MEI's authenticated notice of disposition to MEI's attorney, the court finds that HNB complied with its contractual obligation in the parties' security agreement.

Consequently, HNB is entitled to entry of a declaration on summary judgment that it complied with the notice of disposition requirement of W. Va. Code § 46-9-611(c) and its April 9, 2010 security agreement when it sent authenticated notices of disposition to MEI and Mr. Godfrey in care of their attorney at her law firm address.

**3.     Timeliness of the Authenticated Notice of Disposition of Collateral, its Contents & Commercial Reasonableness of the Private Sale to Myron Bowling**

Having determined that HNB's authenticated notification of disposition of MEI's collateral complied with W. Va. Code § 46-9-611(c), the court must determine the reasonableness of the notification and the reasonableness of the private sale under §§ 46-9-610(b), 46-9-611(b), and 46-9-612(a).   More specifically, these provisions provide:

**Commercially reasonable disposition.** — Every aspect of a disposition of

---

[3] The email was sent by Ms. Bowers to Mark Godfrey at MEI – not Shirley Godfrey. (Document No. 154, Ex. 22).

collateral, including the method, manner, time, place and other terms, must be commercially reasonable. If commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one or more contracts, as a unit or in parcels, and at any time and place and on any terms.

§ 46-9-610(b)

**Notification of disposition required.** — [A] secured party that disposes of collateral under section 9-610 shall send to the persons specified in subsection (c) of this section a reasonable authenticated notification of disposition.

§ 46-9-611(b)

**Reasonable time is question of fact.** — Except as otherwise provided in subsection (b) of this section, whether a notification is sent within a reasonable time is a question of fact.

§ 46-9-612(a).

Under § 46-9-612(b), a notice sent 10 days before the earliest time of disposition is deemed reasonable.   Section 46-9-613 governs the content of the notice.   In particular, a notice must: (1) describe the debtor and the secured party, (2) describe the collateral subject to the intended disposition, (3) state the method of disposition, (4) state that the debtor is entitled to an accounting, and (5) state the time and place of a public disposition or the time after which any other disposition is to be made.   § 46-9-613(1).   "The purpose of this notification is to give the debtor an opportunity to discharge the debt, arrange for a friendly purchaser, or to oversee the sale to see that it is conducted in a commercially reasonable manner."   *Federal Deposit Ins. Corp. v. Lanier*, 926 F.2d 462, 464 (5th Cir 1991); *see also Mancuso v. Long Beach Acceptance Corp.*, 254 S.W.3d 88 (Mo. App. 2008) (same).   While a secured creditor is permitted to choose between a public or private sale of repossessed collateral, the creditor's choice must be a commercially reasonable one. *See, e.g.*, *United States v. Terrey*, 554 F.2d 685 (5th Cir. 1977) (stating that when a creditor elects to liquidate the collateral the creditor's "duty is to make a sincere effort to obtain the full market value for the property."); *see also* W. Va. Code 46-9-627(b) (setting forth some circumstances in which a sale is commercially reasonable).

Here, the Plaintiffs demonstrated a genuine issue of material fact that precludes entry of summary judgment in favor of HNB regarding whether HNB provided a reasonable notice of the

10

private sale of MEI's equipment, and whether the notice sale of MEI's equipment was commercially reasonable.

First, HNB gave inconsistent information to MEI and Mr. Godfrey concerning its intended disposition of MEI's equipment.   On January 20, 2012, counsel for HNB wrote to Ms. Bowers that HNB "will engage an auction company to repossess and prepare the equipment for sale." (Document No. 154, Ex. 10).   Later, on March 2, 2012, HNB's counsel wrote that "Myron Bowling Auctioneers will be coming to pick up equipment collateral on Monday, March 5, 2012 as Huntington Bank's agent."   (Document No. 154, Ex. 15).   Consistent with these communications, sometime before April 6, 2012, MEI received a flyer in the mail from Myron Bowling noticing a public auction of MEI's equipment on April 20, 2012.   (Document No. 154, Ex. 3, ¶ 13).   Myron Bowling's notice of public auction facially conflicted with HNB's March 22, 2012 notice of private sale – which was private, not public.   Thus, MEI's and Mr. Godfrey's counsel had two pieces of paper: one noting a private sale "sometime after April 9th," and the other noting a public sale on April 20, 2012, when previous communications from HNB explicitly stated that it was contemplating an auction and that Myron Bowling – an auction company – was repossessing MEI's equipment as HNB's agent.

Meanwhile, on April 6, 2012, HNB's counsel informed Ms. Bowers that the private sale of MEI's equipment would go forward on April 9th, as planned.   Confused, Ms. Bowers wrote: "MEI received written notice (the flyer of the sale being publically announced) of the public sale on April 20th so I note you indicate there is a private sale.   Was this a private sale based on sealed bids or where did this come from? Guess I'm a little confused.   Could you confirm."   (Document No. 154, Ex. 21).

In the late afternoon on Friday, April 6, 2012, counsel for HNB responded to Ms. Bower's inquiry:

> To clear things up, there will be a private disposition of the equipment after Monday by the Bank under the notice previously sent to you.   The Bank has agreed to accept an offer from Myron Bowling . . . to buy the equipment and plans to sell it to [Myron Bowling] after Monday under private sale unless the Bank receives a better offer beforehand.   The Bank has more than one offer and concluded that [Myron Bowling's] cash offer is highest and best.
>
> We understand that [Myron Bowling], after acquiring the property, intends to

dispose of the equipment on its own behalf at auction.

(Document No. 154, Ex. 21).

Thus, Friday, April 6, 2012, was the first time that MEI and Mr. Godfrey learned that Myron Bowling was not acting as an agent for HNB in publically selling MEI's equipment. Rather, Myron Bowling's notice of public auction was for equipment that was free and clear of HNB's interests.   Only by subsequent email, sent three days before the time when a private sale could occur, was HNB able to "clear things up" as a result of the confusion caused by its March 22, 2012 authenticated notice of disposition.

Second, the March 22, 2012 authenticated notice of disposition sent to Ms. Bowers did not contain any indication that HNB had already executed a purchase agreement for the equipment, or that it was accepting competing bids.   The only listed term of sale was that there would be "no warranty relating to title, possession, quiet enjoyment or the like in this disposition."   (Document No. 154, Ex. 18).   However, on April 6, 2012, HNB's counsel informed Ms. Bowers, for the first time, that HNB had "agreed to accept an offer from Myron Bowling . . . unless the Bank receives a better offer beforehand."   (Document No. 154, Ex. 21).   Ms. Bowers also learned that HNB "had more than one offer" for the equipment.   *Id*.   On April 9, 2012, MEI submitted a bid for its equipment and requested a detailed accounting and recap of the submitted bids. HNB neither provided the accounting nor the recap of submitted bids.

Third, HNB's February 27, 2012 asset purchase agreement with Myron Bowling was not contingent on the receipt of higher and better offers, and Myron Bowling had paid the full purchase price on March 23, 2012 – one day after HNB noticed its private sale.   Specifically, the language of the asset purchase agreement provides:

> 1. Purchaser shall pay Seller the sum of . . . $535,000 . . . for all Equipment in Exhibit "A" . . . . The Purchase Price shall be paid from Purchaser to Seller as follows: a 25% deposit paid upon contract signing and clean lien search, and the balance shall be paid in full in certified funds upon Purchaser's removal of the Equipment from their locations and Seller providing title to the Equipment (including certificates for any titled Equipment) free and clear of liens.
>
> Upon receipt of the Purchase Price, Seller shall provide Purchaser with a Bill of Sale for the Equipment.
>
> . . . .

12

3. For certain untitled items of Equipment on Exhibit "A", Purchaser acknowledges that Seller may have to transfer title to Purchaser by way of an Article 9 UCC sale. Purchaser acknowledges that Seller will utilize the Article 9 UCC sale process to divest certain junior lienholders of any interest they may have or claim to have in any of the Equipment. . . . Seller represents and warrants that Purchaser shall receive good and marketable title to the Equipment, including any Equipment transferred pursuant to an Article 9 UCC sale.

(Document No. 154, Ex, 14).

As stated, the contractual precondition to Myron Bowling's final payment was that HNB provide it with title to the equipment free and clear of liens; thus, Myron Bowling's payment of the full purchase price on March 23, 2012, is inconsistent with HNB's notice of a private sale "sometime after April 9, 2012." In addition, HNB's warranty of title in the asset purchase agreement is inconsistent with HNB's March 22, 2012 authenticated notice of disposition which specifically waived warranties of title.

Fourth, MEI and Mr. Godfrey presented the affidavit of Kevin Teets, a licensed West Virginia auctioneer who had previously appraised MEI's equipment.  Mr. Teets stated that in early 2012 he "aggressively tried to contact [HNB] to express [Pyle Equipment's] interest in being involved in the troubled assets transaction . . . but could not get [HNB] to return [his] calls." (Document No. 153 Ex. 3).  Thus, Pyle Equipment was likely a competitive purchaser of MEI's equipment but was unable to competitively pursue the purchase because HNB was not cooperative.

Fifth, a genuine issue of fact exists regarding whether a private sale of MEI's equipment was commercially reasonable.  For example, HNB asserts that it did not transfer title to Myron Bowling until it executed a bill of sale on April 18, 2012.  Two days later, however, Myron Bowling sold MEI's equipment at public auction that was publically noticed well in advance of the bill of sale date.  The fact that Myron Bowling may have resold MEI's equipment as early as two days after acquiring legal title calls into question the commercial reasonableness of HNB's choice to sell MEI's equipment through a private disposition.  It appears that a commercially reasonable disposition under the circumstances may have been a public auction, as originally contemplated by HNB and as previously communicated to MEI and Mr. Godfrey.

Sixth, the purpose of providing an authenticated notice of disposition is to allow the debtor or guarantor an opportunity to discharge the debt, to arrange for a friendly or competitive

13

purchaser, and/or to ensure that the anticipated sale is conducted in a commercially reasonable manner.   While MEI and Mr. Godfrey were attempting to negotiate a settlement in advance of the noticed disposition, it is not clear whether MEI or Mr. Godfrey had the opportunity to arrange for a friendly purchaser or for competitive bidders considering that HNB had already executed an asset purchase agreement with Myron Bowling.   Also, MEI's attempt to ensure that the asset purchase sale to Myron Bowling was conducted in a commercially reasonable manner was thwarted: MEI specifically requested the sales price that Myron Bowling was paying for its equipment, and the details of any other bids.   HNB did not provide this information.   Consequently, an issue of material fact exists regarding whether HNB's conduct impermissibly thwarted the purpose of providing a pre-disposition notice under the Uniform Commercial Code.

In summary, issues regarding commercially reasonable disposition, notification, and the timing of the notification are questions of fact – not law.   Here, MEI and Mr. Godfrey have presented facts, when viewed in a light most favorable to them as the non-movant on summary judgment, that indicate (1) HNB issued imprecise and varying communications regarding the proposed disposition of MEI's equipment; (2) HNB did not inform parties that it would be accepting and reviewing competing bids for MEI's collateral; (3) HNB may have passed equitable title to MEI's equipment before April 9, 2012; (4) HNB did not communicate with other potential purchasers for MEI's equipment; (5) HNB sold the equipment to an auctioneer, who two days after obtaining legal title, sold the equipment at a previously noticed public auction; and (6) HNB may not have provided an opportunity for MEI or Mr. Godfrey to arrange for friendly or competitive bidders and was not responsive to MEI's request for the details of the private disposition arranged by HNB.   Based on these factors, the court will deny HNB's motion for summary judgment as it relates to the allegations in MEI's complaint that HNB violated W. Va. Code §§ 46-1-304, 46-9-607(c), 46-9-610(b), 46-9-611(b), 46-9-612 and any related causes of action pled by the Plaintiffs under applicable state law.

**4.      Myron Bowling as a Good Faith Purchaser under W. Va. Code § 46-9-617(b)**

Myron Bowling asserts that it is a good faith transferee via its February 27, 2012 asset purchase agreement with HNB.   It further contends that the only allegation of wrongful conduct against it in the Plaintiffs' complaint is wholly unsupported by the record on summary judgment.

14

More specifically, the Plaintiffs' complaint asserts:

> 31.      Myron Bowling . . . was not a good faith transferee under W. Va. Code §
> 46-9-617 entitled to take the collateral free and clear of the rights of MEI in the
> collateral because Myron Bowling . . . had agreed to purchase and had paid for the
> collateral of MEI knowing that notice of intent to liquidate by private sale had not
> been given prior to the payment.

(Compl.).

The Plaintiffs argue that Myron Bowling is not a good faith transferee under § 46-9-617 on the grounds that Myron Bowling must have known that HNB had not given proper notification of private disposition in advance of its February 27, 2012 asset purchase agreement because, in the Plaintiffs' view, HNB could not have given notice of a private disposition in advance of entering into such a private agreement; i.e., Plaintiffs argue that there can be no "pre-agreement notice" of disposition.   Moreover, the Plaintiffs assert that Myron Bowling acted unreasonably in not requiring proof of HNB's authenticated notice of private disposition in advance of signing the February 27, 2012 asset purchase agreement.

Under W. Va. Code § 46-9-617(b), "[a] transferee that acts in good faith takes free of the rights and interests [of the debtor, the secured creditor, and subordinate secured parties], even if the secured party fails to comply with this article or the requirements of any judicial proceeding." "The test of 'good faith' in a commercial setting is ' honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade.'" *Barn-Chestnut, Inc. v. CFM Dev. Corp.*, 457 S.E.2d 502, 508 (W. Va. 1995) (citation omitted); *see also* W. Va. Code § 46-1-201(20) (same).

Myron Bowling submitted two affidavits in support of its motion for summary judgment. First, Phillip Langer, Myron Bowling's legal counsel, stated: "I asked the legal counsel representing [HNB] whether the provisions of Article 9 of the Uniform Commercial Code . . . were being followed, and specifically, whether notification of a private disposition had been sent to the appropriate parties.   [HNB's] counsel confirmed that it was complying with Article 9 and that a notification had been sent before Myron Bowling and [HNB] entered into any agreement." (Document No. 129, Ex. 1).   Second, Greg Hengehold, the managing partner of Myron Bowling, stated: "At all times Myron Bowling . . . had no knowledge or reason to believe that the sale of the Collateral to Myron Bowling might violate the rights of MEI or Shirley E. Godfrey, or that [HNB]

15

had not or was not complying with any requirement of Article 9 relating to the sale of the purchased assets." (Document No. 129, Ex. 2). Thus, according to Myron Bowling, HNB affirmatively represented to it on or before February 27, 2012, that it had already complied with the authenticated notification of private disposition and was in a position to actually sell MEI's equipment when it executed the asset purchase agreement.

When a secured creditor provides an authenticated notice of disposition by private sale, no requirement exists for the secured creditor to have previously identified a buyer or have executed a contract to sell. For example, in *Piper Acceptance Corp. v. Yarbrough*, 702 F.2d 733, 734 (8th Cir. 1983), the secured creditor gave notice of a private sale on October 20, 1981, listed the collateral for sale in a trade publication on November 15, 1981, and consummated the private sale on April 26, 1982. The debtor contended that the debtor was not given reasonable notification of the time after which a private sale was to be made because more than five months elapsed between the time the debtor received notice of a private disposition in October and the consummation of the sale the following April. The court held that claim to be without merit: "[t]he purpose of the reasonable notification requirement is to afford debtors 'sufficient time to take appropriate steps to protect their interests by taking part in the sale or other disposition if they so desire.'" *Id*. at 735. It was not material that the notice of private disposition was given in advance of the identification of a potential buyer. *Id.*

Likewise, W. Va. Code § 46-9-613 contains no requirement that a secured creditor must have executed an agreement to sell in advance of providing a private notice of disposition, § 46-9-610(b) does not prescribe any time limits for commercial dispositions, and comment 3 to § 46-9-610 recites that the policy of Article 9 is to "encourage private dispositions through regular commercial standards." Consequently, the court finds no prohibition in providing an authenticated notice of private disposition in advance of having identified a potential purchaser; thus, it was reasonable for Myron Bowling's counsel to believe HNB's assertion that an authenticated notice of private disposition had been given in advance of the February 27, 2012 asset purchase agreement because a notice of disposition does not have to follow a contract to sell.

The Plaintiffs' second argument that Myron Bowling actually needed to request and review HNB's authenticated notice of private disposition in advance of signing the February 27, 2012

asset purchase agreement is similarly without merit.   W. Va. Code § 46-9-617(b) specifically states that a transferee may act in good faith "even if the secured party fails to comply with this article or the requirements of any judicial proceeding."   The fact that Myron Bowling's counsel inquired of HNB as to whether HNB was selling MEI's equipment under Article 9, and HNB's counsel replied that it had already complied with the notification requirements for a private disposition under Article 9 is evidence supporting Myron Bowling's good faith – not evidence supporting a finding of a lack of good faith.   Without more, acting in good faith does not mean that Myron Bowling had to presume HNB was a liar.

Moreover, Myron Bowling consistently acted with its stated belief that the requirement for notice of a private disposition had been previously satisfied.   It picked up MEI's equipment on March 5, 2012, it paid the full purchase price to HNB on March 23, 2012, and it noticed a public auction for April 20, 2012.   Myron Bowling was not copied on HNB's March 22, 2012 notice of private disposition and there are no emails or statements in the record on summary judgment that Myron Bowling ever knew of a potential defect in HNB's authenticated notice of private disposition.

Consequently, on summary judgment, viewing the facts in a light most favorable to the Plaintiffs as the non-movants, the court finds no support for the Plaintiffs' allegations in ¶ 31 of their complaint that Myron Bowling agreed to purchase and pay for MEI's equipment knowing that notice of intent to liquidate by private sale had not been given by HNB.   Because ¶ 31 is the only allegation in the complaint of wrongdoing by Myron Bowling, the court will grant Myron Bowling's motion for summary judgment and dismiss it as a party defendant to the Plaintiffs' complaint.

## IV. CONCLUSION

For the reasons stated above, the court will enter a separate order that grants in part and denies in part HNB's motion for summary judgment and will dismiss Myron Bowling as a party defendant.